**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**JARVIS FORTSON,**

       **Petitioner,**

**vs.**                                    **Case No. 4:08cv489-RH/WCS**

**WALTER McNEIL,**

       **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

Petitioner filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the judgment of the Second Judicial Circuit, Gadsden County, case number 99-760-CFA. Doc. 1. After receiving multiple extensions of time to respond, Respondent sought dismissal of the § 2254 petition as untimely filed. Doc. 19. Petitioner filed a reply, doc. 21, and the motion to dismiss was denied. Doc. 24 (adopting report and recommendation, doc. 22).

Respondent filed an answer supported by a supplemental appendix, containing Exs. BB-HH. Doc. 26 and 26-1 (appendix of exhibits as scanned into ECF) (electronic case filing). Petitioner filed a reply. Doc. 28. References to Exs. A-AA are to those

submitted in paper form with the motion to dismiss (doc. 19), and references to Exs. BB-HH are to those electronically filed as docs. 26-1 and 26-2 in ECF.

**Procedural History**

Petitioner proceeded to a nonjury trial on February 9, 2001, represented by attorney Steven Seliger. Ex. B. The case was prosecuted by Assistant State Attorneys John Leace and Phil Smith.

Petitioner was charged with attempted first degree murder, possession of a firearm by a convicted felon, and retaliation against a witness causing bodily injury. Ex. B, pp. 170-171 (summary of counts by the trial judge).[1]

On the record it was noted that Petitioner had executed a waiver of jury trial at the pretrial conference the Friday before, and the case had been set for that Friday (February 9, 2001) for a nonjury trial. *Id.*, p. 3. Petitioner repeated, under oath, that he wanted to waive his right to a jury and no one had made any promises or threats. *Id.*, pp. 3-5. The prosecution made a brief opening statement, defense counsel did not. *Id.*, pp. 5-6.

Marlon Horne testified that on October 27, 1999,[2] he was driving about a block from his home and Petitioner swerved in front of him on his bike. *Id.*, p. 8-9. He said Petitioner acted like Horne had tried to run him over, and they exchanged words but not blows. *Id.*, pp. 9-10.

---

[1] An information and amended information were filed. See Ex. B, p. 3 (counsel noting "I'm not sure if he was ever arraigned on the amended Information, but we would waive reading on the Information and plead not guilty."). Copies of those documents were not included in the exhibits filed by Respondent.

[2] Marlon Horne was 18 years old at that time. *Id.*, p. 28.

Horne went home and parked his car in his back yard.  *Id.*, p. 35.  He said he told his brother, who was on a porch directly across the street at the Williams's residence, to avoid Petitioner because he was threatening them and calling them "pussy niggers." *Id.*, pp. 10-11, 13-14.  Horne said he was talking to his brother when Petitioner walked down the path with a pipe in his hand as if Petitioner were going to hit him.  *Id.*, p. 12. Horne said he grabbed an iron wrench, and told Petitioner if he put the pipe down he would put the wrench down.  *Id.*

Marlon Horne later said he grabbed an iron rake to defend himself.  *Id.*, p. 17.[3] When Petitioner came towards him with the pipe, Horne said he started to head home and "that's when he kind of like got up on me," so Horne picked up a rake and told Petitioner if he put the pipe down then Horne would put the rake down.  *Id.*, p. 16.  He said Petitioner was calling him "pussy ass nigger" and "police ass nigger."  *Id.*, pp. 16-17.  Horne said he and Petitioner were both in the road about 25 feet apart, and Petitioner dropped the pipe so Horne dropped the rake, and thought that they then would fight hand to hand.  *Id.*, pp. 17-18.  Horne said Petitioner then walked maybe five feet toward him, still calling these names, and then pulled out a gun and started shooting.  *Id.*, pp. 18-19.  Horne saw Petitioner pull the gun from his pocket, and said it was a black .25 or .22 revolver.  *Id.*, p. 20.  Horne said the first bullet whizzed by only inches from his cheek; then he was running and thought he was hit by the second shot.

---

[3] It may be that the court reporter initially misheard Marlon Horne say iron wrench rather than iron rake.  If he had said wrench and then said rake, two completely different things, it seems that would have been brought out on cross examination or closing argument.  As set forth *infra*, defense counsel did inquire on cross examination whether Marlon Horne had previously said Petitioner was carrying a walking cane rather than a pipe.

Case No. 4:08cv489-RH/WCS

*Id.*, p. 20. He said while running, "I steady hear him saying, 'Pussy ass nigger, you don't know me,'" over and over while, until the gun ran out of bullets. *Id.*, p. 21. Horne thought Petitioner fired five or six times before the gun was empty, but said he did not know he was hit until he saw blood. *Id.*, pp. 21-22. Horne said he felt blood streaming out of his neck. *Id.*, p. 22. The police arrived in a few minutes, and Officer Ulm covered him with a quilt. *Id.* He was taken to the hospital by ambulance, but the bullet could not be removed from his neck because it was too close to his arteries. *Id.*, pp. 22-23.

Marlon Horne said his brother Derrick, stepfather Clifford, neighbor Tony Barker, uncle George Hollis, and probably some other guys were there on the porch when he went to talk to his brother. *Id.*, p. 23. He did not see what anyone else was doing when the shooting started, but he thought Derrick was on the edge of the Williams's yard, trying to get him to go into the house. *Id.*, p. 25.

Marlon Horne testified that earlier, he had been called as a witness by the prosecution in a case against Petitioner, after which Petitioner went to prison for two or two and one-half years. *Id.*, pp. 25-26. Horne saw Petitioner again when he got out of prison, in August of 1999, and the shooting was on October 27, 1999. *Id.*, p. 26. In those two months he saw Petitioner around the neighborhood and said Petitioner, "would throw looks with his eyes," but they did not exchange words and Horne tried to stay away from Petitioner. *Id.*, p. 27. Horne repeated that Petitioner was "steady talking" and calling him "pussy ass police nigger" and saying "you sent me down," which Horne took as a reference to him testifying against Petitioner. *Id.*, p. 28.

On cross examination, Marlon Horne said Derrick is his brother, Harlon Horne is his twin brother, and they all lived together. *Id.*, pp. 29-30. Horne said that in the other

case, Petitioner was charged with aggravated battery with a firearm against Hakeem Byrd, or hitting Byrd in the head with a firearm. *Id.*, p. 30. Horne said he testified in that case that he did not see Petitioner with a gun, so his testimony was helpful to Petitioner rather than to the prosecution. *Id.*, p. 31. The state had accused Petitioner of having a gun. *Id.*

Horne said it looked to him like Petitioner was carrying a pipe. *Id.*, p. 33. It was something black in his hand, but he did not get close enough to examine it. *Id.* He did not recall telling Sergeant Ulm that Petitioner had a walking cane rather than a pipe. *Id.* He said that after Petitioner swerved the bike and they had words, he (Horne) went home and parked his car in the back, between two trees. *Id.*, p. 35. Horne said he started walking across the street towards his brother and Petitioner appeared on the path. *Id.*, pp. 36-37. He said that Petitioner was not yelling at him but he could clearly hear and understand what Petitioner was saying. *Id.* Horne said no one in his family tried to get between them when Petitioner had the pipe and he had the rake. *Id.*, pp. 38-39.

Horne repeated that Petitioner was continually making the same statements to him (quoted previously), and he understood that Petitioner was angry with him for testifying. *Id.*, p. 39. He did not recall telling Sergeant Ulm that he said to Petitioner "you have a beef with me," but he did say "problem." *Id.*, pp. 39-40. He did not recall telling Sergeant Ulm that Petitioner said "you have a beef with me" to him. *Id.*, pp. 40-41. He said Petitioner shot once and then Horne started running, not to his house but around the Williams's house. *Id.*, p. 44. He said Petitioner was running behind him, which would be west, and he did not recall telling Ulm that Petitioner was running south.

*Id.*, p. 45-46.  Horne did not remember if he wrote out his own statement, but did remember talking to the police officer while the blood was coming out of his neck.  *Id.*, pp. 47-48.  On redirect, Marlon Horne agreed that he testified in the other case against Petitioner and then Petitioner went to prison.  *Id.*, pp. 48-49.

Paramedic John Perkins testified that he arrived on the scene at 7:02 P.M.  *Id.*, pp. 59-60.  He found Marlon Horne lying on his back on a lawn near the street, with a police officer applying pressure to what appeared to be a gunshot wound on Horne's neck.  *Id.*, p. 51.  Horne was alert and oriented.  *Id.*  They immobilized Horne and left the scene at 7:14 P.M. to transport him to the hospital.  *Id.*, p. 52.

Derrick Horne testified that he was at the home of Willie Mae Williams the day of the shooting, he was sitting and talking with people including his stepfather, Clifford Knight.  *Id.*, pp. 53-54.  His brother Marlon came up to tell him about an incident involving Petitioner that had just happened around the corner.  *Id.*, p. 55.  Derrick Horne said he saw Petitioner coming through a path to the house, with a black stick or cane in his hand.  *Id.*, pp. 57-58.  Derrick Horne said his brother told Petitioner to put it down and fight like a man.  *Id.*, p. 58.  Then he saw Petitioner pull out a gun and start shooting at Marlon Horne, who started running.  *Id.*  Derrick Horne did not hear Petitioner say anything "until there was a couple of words when he told him to fight him like a man and he called him a pussy and all like that," and Petitioner "was like no, 'pussy ass police nigger,' and all like that there."  *Id.*, pp. 58-59.  He said Petitioner pulled the gun, a small revolver, from his hip.  *Id.*, p. 59.  He saw Petitioner running behind Marlon Horne shooting, and saw fire coming from the gun.  *Id.*, pp. 59-60.  Derrick Horne said Petitioner shot five or six times, and continued pulling the trigger "[u]ntil it was all going

click, click, click," indicating the gun was out of bullets. *Id.*, p. 60. He said there would be clicks between shots, as the gun did not shoot every time Petitioner pulled the trigger. *Id.* Derrick Horne said, "when he started shooting, he wasn't saying nothing but 'Um, Um,' like that right there." *Id.*, p. 62.

Derrick Horne said he got a state subpoena to testify against Petitioner in the other case and he went to the trial but did not testify. *Id.*, p. 63. He did not see Petitioner until after Petitioner got out of prison, and when he saw him, Petitioner would mumble under his breath. *Id.* He said one time they had a conflict, that Petitioner was "[f]ussing about . . . that testifying thing," saying that next time he (Petitioner) went to prison, "[']one of you all pussy ass nigger's mama gonna be in a black suit, because I ain't going back to prison.'" *Id.*, p. 63-64. Derrick Horne took this as a threat. *Id.*, p. 64.

On cross examination, Derrick said he also goes by the name Derrick Hollis. *Id.*, pp. 64-65. He said he lived with his younger brother Marlon Horne. *Id.*, p. 65. He was shown a copy of the statement he made to police, and agreed there was not anything on the statement about Petitioner carrying a black stick. *Id.*, pp. 65-67. He agreed that his statement was that he saw Petitioner and Marlon arguing but "could not make what they were arguing about," and explained "I ain't know what they arguing about, but I heard what he said." *Id.*, p. 67. He said he did not then tell the officer what they were arguing about, but he did later. *Id.*, pp. 68-69. He thought he told the officer that Marlon picked up a rake, but did not see that in his statement. *Id.*, p. 69. Derrick Horne said he was next to his brother, not on the porch with the others, when Petitioner started shooting. *Id.*, p. 70. He said he started running behind them but then stopped. *Id.*, pp. 71-72. Derrick Horne said that when he signed the statement he was nervous and

upset since his brother had just been shot, that "I just signed it so I can go check on my brother because I didn't have really time for this right here. My brother had done been shot." *Id.*, pp. 73-74. He said that what the officer wrote in the report "was true. Half." *Id.*, p. 74. Derrick Horne said when Petitioner had the stick and Marlon had the rake, no one in the family tried to break them apart or tell them to stop. *Id.*, p. 75.

It was brought out on redirect that Derrick Horne's statement also failed to mention that Marlon Horne was bleeding, or that Derrick Horne had called the police and told his brother to lie down because he was shot. *Id.*, pp. 75-76. Derrick Horne admitted that his statement was incomplete, and was written only about 30 minutes after his brother had been shot, while Marlon was on his way to the hospital. *Id.*, pp. 76-77.

Clifford Knight testified that he is engaged to Frankie Hollis, and said Marlon Horne is like a stepson to him. *Id.*, pp. 77-78. Knight was on the porch that day talking with six or seven others, including Derrick Horne, George Hollis, and Besharna Hollis. *Id.*, p. 79. He saw Marlon Horne drive up and stand in the yard, and then saw Petitioner come down the road with a walking stick in his hand. *Id.*, pp. 80-81. Knight said he heard them arguing but not what they were arguing about. *Id.*, p. 81. He said they were 20 or 25 feet apart, and Marlon had picked up a rake. *Id.*, p. 82. Knight said he saw Petitioner pull a small revolver out from behind his back. *Id.* He said Petitioner immediately started firing, and Marlon Horne started running. *Id.*, p. 83. Knight said Petitioner fired four or five shots until the gun emptied and was clicking. *Id.*, p. 84. Knight said the gun was loaded and he could see fire when it was shooting, and when

he heard the gun clicking the gun was not firing. *Id.*, p. 85. He did not hear Petitioner or anyone say anything when Petitioner pulled out the gun. *Id.*, pp. 85-86.

On cross, Knight said Marlon did not come to the porch, and he did not remember Derrick going over to Marlon. *Id.*, p. 87. Knight said he signed his statement after looking over what the officer had written. *Id.*, p. 88. He referred to Petitioner as "the guy" at the time of his statement because he did not know Petitioner's name until later. *Id.*, pp. 88-89. Knight said that they all, including Derrick Horne, left the porch together to go to Marlon Horne. *Id.*, pp. 90-91. He said Petitioner had dropped the stick in the street, and after the shooting Petitioner, had to run around the Williams's house to go pick it up and run back down the path. *Id.*, pp. 93-94. On redirect, Knight said he had no doubt that Petitioner was the person who shot his stepson, Marlon Horne. *Id.*, p. 94.

Tony Barker testified that on October 27, 1999, he was washing his car and started hearing "guys fussing," and tried to ignore it but the sound was coming closer. *Id.*, p. 96. He recognized Jarvis (Petitioner), and two brothers he knew as Fats and Pee Wee. *Id.*, p. 98. Barker did not hear what was being said. *Id.*, p. 99. Barker said he saw Jarvis and Fats running, and Jarvis was chasing Fats. *Id.* Then he heard gunfire, so he hid under his car. *Id.* Barker said he did not see the gun but heard gunfire, "like I say, I couldn't see the weapon because I was hiding, myself." *Id.*, pp. 99-100. He thought the gun ran out of bullets and "then, you know, it stopped and [Jarvis] turned around and went the other way. He just left the scene." *Id.*, p. 100. Barker did not see a gun, but heard gunfire from the direction that Petitioner was chasing after Fats, holding his arm out. *Id.*, p. 101. He said he saw Fats walking toward his house, but

"evidently he didn't know that he was shot." *Id.* They had him lie on the ground and covered him with quilts until help arrived. *Id.* Barker said before the shooting he saw Jarvis with a stick, but he did not see Fats with anything, and Barker could not figure out what they were arguing about. *Id.*, pp. 101-102.

On cross examination, Barker said that he was in his front yard washing the car, and saw people fussing by the oak tree behind the house. *Id.*, pp. 104-105. He said there were lots of people and discussion, but he could not tell who was saying what. He identified Derrick Horne, George Hollis, Pee Wee, Tory Hayes, and Clifford Knight as in the group by the tree, not on the porch. *Id.*, pp. 105-106. Barker said he looked up when he heard gunfire and saw Fats running in the street with Jarvis running behind him. *Id.*, pp. 106-107. Barker did not see anyone running behind Jarvis. *Id.*, p. 108. He did not know the man was named Jarvis until later, when the Horne family told him. *Id.*, pp. 108-109. Barker said he did not specifically see Jarvis and Fats fighting by the tree, and so did not see anyone try to break up any fight between them. *Id.*, p. 109.

Sergeant John Ulm of the Havana Police Department testified that when he arrived at the scene Marlon Horne was on the ground, bleeding from the neck. *Id.*, pp. 110-111. Ulm was the first officer there, and immediately started applying pressure to an apparent gunshot wound, to stop the bleeding. *Id.* Ulm said Horne's body felt cold but he was speaking, and told Ulm who shot him. *Id.*, p. 117. He said they talked for about ten minutes before Horne was taken away by ambulance. *Id.*, p. 124.

Ulm said they did not find any spent shells on the ground in the area, or locate any weapons or walking sticks in the area. *Id.*, pp. 112, 118. He said that about thirty minutes later he and Chief Mitchell went to the home where he knew Petitioner lived

with his mother, Wilma Porter,[4] and obtained oral consent from Ms. Porter to search the house for Petitioner or weapons. *Id.*, pp. 112-113. They found a purple walking cane or stick lying on the floor in a room by the foyer. *Id.*, p. 114. It had been described to Ulm when he initially talked to the victim. *Id.*

Ulm did not see Petitioner until June 7, 2000, when he was notified that Petitioner had turned himself in at the Sheriff's Office. *Id.*, pp. 115-116. Ulm said they had tried to locate Petitioner in the interim, through Crime Stoppers, and a segment aired (presumably on television), and by contacting the Florida Department of Law Enforcement. None of these efforts yielded any results. *Id.*, pp. 116-117.

On cross, Ulm said he went to search the house knowing Petitioner lived there, and said he was looking for Petitioner or a gun. *Id.*, p. 118. Ulm filed a report of his interview with Marlon Horne shortly after the shooting, and agreed that Horne told him Petitioner said "[d]o you have a beef with me?" *Id.*, p. 119-120. He did not interview anyone else at the scene, those interviews were done by another officer. *Id.*, p. 123.

The state rested. *Id.*, p. 125.

George Hollis, Marlon Horne's uncle, was called as a defense witness. *Id.*, p. 126. He said that in October, 1999, he was living with his sister, Frankie Hollis, and her son (his nephew), Marlon Horne. *Id.*, pp. 126-127. Hollis was on the porch across the street with Clifford Knight and Derrick Horne. *Id.*, pp. 127-128. He said he saw Marlon standing in the back yard by some big oak trees. *Id.*, p. 129. Hollis did not see a bunch of people around Marlon then. *Id.*, p. 140. He then saw Petitioner walking in his

---

[4] Wilma Porter is Petitioner's mother. *Id.*, p. 174 (sentencing transcript).

direction, and saw Petitioner and Marlon Horne were arguing. *Id.*, pp. 130-131. Hollis

said he walked out to the middle of the street to where they were arguing, trying to

break it up. *Id.*, pp. 131-133. He thought they were separated and nothing else would

happen, so he walked away. *Id.*, pp. 133-134. Hollis said Petitioner had a stick and

Marlon had a rake, he thought he saw Marlon put down the rake. *Id.*, p. 133. Petitioner

put the stick down, and then pulled out a pistol and started firing. *Id.*

Hollis said he was walking back towards the Williams's house when the shooting

started. *Id.*, p. 134. He thought everyone else stayed on the porch. *Id.*, p. 135. When

Hollis heard the shooting he turned around and saw Marlon running, with Petitioner

following him. *Id.*, pp. 135-137. The gunfire stopped and then Hollis heard a clicking

sound from the gun. *Id.*, p. 137. Hollis did not see Derrick or anyone else running

behind Petitioner. *Id.*, p. 139. Marlon was still running after the shooting ended, so

Hollis did not know that Marlon had been shot until he saw him. *Id.*, pp. 139-140. On

cross, Hollis said he heard five or six shots, then heard the gun click indicating it was

empty of bullets. *Id.*, p. 141.

Eddie Hudson, an officer with the Havana Police Department, testified that he

collected statements from witnesses after Marlon Horne was shot. *Id.*, pp. 142-143.

Hudson said he asked for whomever saw what happened to please come forward and

give him a statement. *Id.*, p. 143. He took the statement for Derrick Horne and wrote it

out for him as Derrick told him he was too upset to write. *Id.*, pp. 144, 147. Hudson

said he went over the statement with Derrick Horne, who then signed it. *Id.*, p. 148.

That statement did not mention that Petitioner had a walking cane, or that Marlon Horne

had a rake. *Id.* He said that Derrick Horne told him he could not make out what Marlon

Horne and Petitioner were arguing about.  *Id.*, pp. 149-150.  Hudson said Derrick Horne did not mention any prior threats from Petitioner when giving his statement.  On cross, Hudson said he took eight statements that night over a two hour period.  *Id.*, pp. 150-151.  He thought he wrote out seven of them, with only Tory Hayes writing his own statement.  *Id.*, p. 152.  Hudson said he wrote out the statement for Hollis, but by oversight, failed to write on it that he had done so.  *Id.*, pp. 152-153 (redirect).

Sergeant Ulm was recalled as a witness for the defense.  He said that during the interview with Marlon Horne, he did not recall Horne saying that Petitioner was shooting at him because of his previous testimony against Petitioner.  *Id.*, pp. 153-154.  Asked if that was something he would have wanted to know, if that was Petitioner's reason for doing it, he said "[y]es, sir, it could be." *Id.*, p. 154.  The defense introduced the amended information in the prior case and transcript (including Marlon Horne's testimony) in that case, and then rested.  *Id.*, p. 155.

The prosecution argued that premeditation had been proven.  The prosecution argued that there was testimony that Petitioner was not happy with the Horne brothers because he thought they were on the side of the police, that they had come to testify against him in another case, and Petitioner went to prison.  *Id.*, pp. 156-157.  Even aside from the revenge motive, the prosecutor argued that Petitioner had had a run-in with Horne and then, with premeditation, went by Horne's house later with a loaded gun. It was further argued that there was time for reflection on what he was doing between each of the four to six shots fired.  *Id.*, pp. 157-158.  It was argued that Petitioner was shooting to kill, based on the testimony that the first shot whizzed by Horne's head, and the evidence that a bullet went in his neck.  *Id.*  It was argued that the defense of heat of

passion was contradicted by evidence that Petitioner had the presence of mind to pick up the walking stick before fleeing the scene. *Id.*, p. 159. The prosecution conceded there were differences in details given by witnesses, but pointed out that all of them had said "that Jarvis Fortson chased Marlon Horne around Ms. Williams' house, shooting at him," and no affirmative defense had been offered. *Id.*, pp. 159-160.

Defense counsel argued that the judge had to look beyond that simple consistency, as "this was conceived as a concerted and orchestrated effort by the Hollis-Horne family to blame Jarvis Fortson for the shooting of Marlon Horne, and this effort was made to conceal the true nature of what happened out there." *Id.*, p. 161. He argued that the stories were different:

> And of course it's easy to say Jarvis Fortson, he had the gun, he shot, you got six people to agree on that, end of story. But it's not the end of the story. You have to tell the tale of the story, and telling the tale came through people who had a common interest in how this case would be resolved.

*Id.* Counsel pointed out that Marlon Horne testified about verbal threats made by Petitioner, but he did not disclose that to police earlier and no one other than Derrick Horne – who also failed to so state during his police interview – testified they heard what they were arguing about. *Id.* Counsel argued that Derrick Horne never actually testified against Petitioner, and Marlon Horne's testimony was favorable to Petitioner in the prior case. *Id.*, p. 163. The witnesses gave inconsistent accounts of where Petitioner pulled the gun from, his pocket or behind him, "any number of places," and whether he was at the oak tree or in the road. *Id.*, p. 165.

Counsel asserted that a reasonable conclusion was that the walking stick ended up in Petitioner's house because Petitioner never had a gun; he had the stick and left

with it. *Id.* Counsel argued that Barker was the only witness not related to the Horne and Hollis family, and his testimony was different from that of everyone else, and he said he never saw a gun. *Id.*, pp. 166-167. He pointed out that George Hollis said he tried to break up the fight, but other witnesses said no one did. *Id.* Counsel suggested that if Petitioner had been plotting revenge, it would be "nonsense" for him to do it in front of Horne's family. *Id.*, p. 167.

The prosecutor responded by arguing there was no question that Marlon Horne was shot in the neck. *Id.*, p. 169. He asked what possible interest Horne's family could have in blaming the wrong person. *Id.*, p. 169. He pointed out that the witnesses were there when bullets were flying, a family member was being chased by someone shooting, "and they are expected to pay attention to whether another brother is on the right side of the road, left side of the road? This is what should be going through their minds?" *Id.*, p. 169. He said while Barker said he did not see a gun, "he said he saw Jarvis Fortson chasing Marlon Horne down the road with his arm extended and gunfire coming from his location." *Id.*, p. 170.

The judge found Petitioner guilty as charged of attempted first degree murder with a firearm causing injury (count one), and possession of a firearm by convicted felon (count two), but found him not guilty of retaliation against a witness causing bodily injury (count three). Ex. B, pp. 170-171. When the court announced its verdict, Petitioner threw over a table in the courtroom and said, "[a]w, shit, man. Fuck that." *Id.*, p. 171. Counsel twice told him to relax. *Id.*, p. 172. The judge set a sentencing date and did not (according to the transcript) respond to Petitioner's outburst. *Id.*

Petitioner elected not to make a statement at his sentencing.  *Id.*, p. 174.  His mother and brother were present but also chose not to make statements.  *Id.*  There was argument as to whether Petitioner should be sentenced to life as a Prison Releasee Reoffender (PRR).  *Id.*, pp. 174-178.  The prosecutor argued that Petitioner "ought to get a life sentence under PRR and he ought to get a life sentence under the 10, 20, Life mandatory, and they ought to run concurrent," and that he should get fifteen years on count two to run concurrent.  *Id.*, p. 180.

Instead of a life sentence, the court sentenced Petitioner to 30 years on count one and 15 years on count two, to be served concurrently.  *Id.*, pp. 180-181.  Asked if this was a PRR sentence, the judge said "[n]ot if you're telling me I have to mandatorily give him life under a PRR sentence. . . .  That's why I'm not sentencing him as a PRR." *Id.*, p. 181.  The prosecutor objected to the court's failure to impose a PRR sentence or 10, 20, life sentence.  *Id.*, pp. 181-182.

The judgment was reversed on appeal and remanded for resentencing.  Ex. C (opinion of October 14, 2002).  The court found error in the trial court's failure to determine whether Petitioner qualified as a prison releasee reoffender, noting that defense counsel never argued Petitioner did not qualify.  *Id.*, pp. 2-3.  At resentencing, Petitioner was sentenced as a PRR to life with a 25 year minimum mandatory term.  Ex. D.  The judgment was affirmed.  Exs. E and F.

Petitioner then filed a FLA.R.CRIM.P. 3.850 motion. Ex. I (amended motion).[5]  In ground one, he asserted ineffective assistance of counsel for failing to call Larry Wilcoxson as a witness, as Wilcoxson was present at the scene and would have testified that Petitioner never produced a weapon or shot the victim.  Ex. I, p. 112 (of record, p. 8 of motion).  On the Rule 3.850 form he summarized this claim as "counsel failed to call alibi/material witness to trial after interviewing witness [and] obtaining exculpatory evidence."  *Id.*, p. 110.[6]

In ground two, Petitioner asserted ineffectiveness based on counsel's failure to interview or call Torry Hayes and Dale Williams as witnesses.  Id., p. 113.  He claimed that these witnesses were willing to testify, were witnesses at the scene, and would have testified that Petitioner did not possess or discharge a firearm.  *Id.*

In ground three, Petitioner claimed counsel was ineffective in advising him to proceed to a nonjury trial, telling Petitioner "he had a better chance with a judge trial because of his mental illness [and] the judge would be sympathetic, [and find] him not guilty.  And that a jury of his peers would immediately render a guilty verdict against a young black man who has a mental illness."  *Id.*, pp. 113-114.  Petitioner claimed his waiver of the right to a jury trial was not knowing and voluntary.  *Id.*

---

[5] He filed a Rule 3.850 motion raising three grounds for relief, and filed a supplement.  Ex. G.  He voluntarily dismissed the initial motion (Ex. H), and filed the amended motion.

[6] In the initial motion, noted in the prior footnote *supra,* Petitioner asserted that "counsel was ineffective when he failed to investigate alibi witnesses," identifying one of the witnesses as Wilcoxson.  Ex. G, p. 90.  Petitioner alleged that Wilcoxson gave an unsworn statement to counsel but was never advised of the trial date and time, and counsel did not "even effect subpoena" for this witness.  *Id.*

In ground four, Petitioner claimed ineffectiveness in counsel's failure to depose any of the prosecution witnesses before trial, in order to prepare for trial and impeach them as might be warranted. *Id.*, p. 114. He claimed Tony Barker and Derrick Horne gave testimony very different from their statements to police after the shooting, and if counsel had deposed them he could have impeached them and undermined their credibility at trial. *Id.*, p. 115. Petitioner also claimed "the testimony of Clifford Knight was crucial," and counsel should have "used this contradictory testimony to aide the defense had he possessed prior knowledge of it after deposing these state witnesses." *Id.* (case citation omitted).

In ground five, Petitioner asserted counsel's ineffectiveness for failing to inform the court that Petitioner was incompetent to proceed to trial, citing FLA.R.CRIM.P. 3.210(b) and 3.211. Instead, Petitioner claimed that once counsel was "alerted to" his mental illness, counsel had a doctor interview him at the jail, and that doctor sent another doctor who immediately prescribed psychotropic medication. *Id.*, pp. 115-116. Petitioner claimed the trial court should have been advised of the need for an inquiry to determine competency, and was unaware of his mental illness or use of mind-altering drugs. *Id.*, p. 116.

In ground six, Petitioner alleged that counsel was aware he "was heavily medicated under various mind altering psychotropic drugs, for his mental illness," as "it was counsel's contacts with several officials which prompted this treatment." *Id.* He claimed counsel knowingly allowed him to proceed to trial in a haze, unaware of the proceedings, like a "zombie." *Id.*, pp. 116-117.

In count seven, Petitioner faulted counsel for failing to file a motion for judgment of acquittal, thus failing to preserve appellate review of sufficiency of the evidence. *Id.*, p. 117. In ground eight, he faulted counsel for failing to file a timely motion for new trial. *Id.*, pp. 117-118.

The state court entered an order denying relief on Rule 3.850 grounds two, three, four, seven and eight, denying appointment of counsel, and setting a hearing on grounds one, five, and six. Ex. J.

An evidentiary hearing was held on July 27, 2006. Ex. K (transcript). Petitioner told the court at that time that he did not know what was going on, did not have a lawyer, and that a law clerk at the prison had filed the motion for him. *Id.*, pp. 2-3. Petitioner said he did not know the law, and did not know how to read or write. *Id.*, p. 4. The judge said he would let Petitioner know when it was his turn to testify. *Id.* He advised, "Mr. Fortson, you filed this thing and I'm giving you a hearing. And by golly we're going to have it today, okay? All right." *Id.*

The state called the first witness, defense counsel Steven Seliger, and the transcript reflects: "(Court [begins] swearing in witness but is interrupted when defendant flips defense counsel table and rushes the bench)." *Id.*, p. 5. The court advised Petitioner that "the best thing you can do is cooperate. We'll still try to give you your hearing if you want it." *Id.* Petitioner had to be restrained by bailiffs. *Id.* The court asked if he wanted to have a hearing or not, yes or no, and Petitioner said "I'd like to know what's going on. I don't know what you're talking about." *Id.* The judge explained to Petitioner it was his choice, that he had the right to testify at the hearing, the hearing would be done in his presence or his absence, but "I think it's best if you stay here." *Id.*

Petitioner said "I don't know what you're talking about, sir." *Id.* The court reporter wrote

that Petitioner was "continuing to be belligerent and interrupt the court;" Petitioner twice

interrupted the judge by saying "shit man." *Id.*, p. 6.

> The court said:
>
> Have a nice day. Let the record reflect that Mr. Fortson – I don't know
> exactly what he did because I was swearing in the witness, but apparently
> he flipped the table. I don't know if he was trying to attack me, or Mr.
> Seliger or anybody, but he's obviously upset because he couldn't have a
> lawyer.
>
> I talked to him yesterday back in the holding cell and he was complaining
> about that he didn't have a chance to call his witnesses. So I got on the
> phone, got his mother on the phone, let him talk to his mother to try to get
> his witnesses here today. And she was going to try to get his witnesses
> here today.
>
> The case has been pending for something like two months and he was
> wanting to get witnesses yesterday, so I've tried to accommodate him.
> And as they say, no good deed goes unpunished. So I'll go ahead an[d]
> conduct this hearing outside of his presence. He's obviously indicated he
> doesn't want to be present for this. And I'll check with him at various times
> to see if he wants to come in and participate.

*Id.*, p. 6. The court asked a bailiff to stay with Petitioner so "if at any time he indicates a

desire to be here at this hearing, he can do it. But he can't be acting like that and be

present." *Id.*

Seliger testified that he had been a lawyer about 30 years. *Id.*, p. 8. He said he

did not have a present memory of the case but had retrieved his file. *Id.* Seliger had a

note in the file with the name and address for Larry Wilcoxson, and his office had issued

a trial subpoena for him, so Seliger assumed he must have talked to Wilcoxson about

the case. *Id.* Since Petitioner was not in the courtroom the court reminded counsel to

not offer any attorney client communications beyond necessary as relevant to the

ineffective assistance of counsel claims. *Id.*, p. 9. Seliger testified that his note (in the file) regarding Wilcoxson "is that he was present with another number of people at the time the shooting took place." *Id.*, p. 10.

Seliger was "fairly confident" he interviewed Wilcoxson, and said he would have taken notes, but did not see any notes in the file. *Id.*, p. 13. He did not recall deciding not to call Wilcoxson, but "[t]he answer would have been, he didn't have information that would have helped Mr. Fortson." *Id.* On further questioning from the court, Seliger said he did not know whether Wilcoxson failed to appear for trial, or maybe did "and again, we just talked about [what] he would have said and after hearing the evidence in the State's case we made the decision that it wasn't necessary or helpful." *Id.*, pp. 13-14. Since he had written down that Wilcoxson was there at the time of the shooting, Seliger did not think Wilcoxson was a potential alibi witness. *Id.*, p. 14.

Seliger did not have any memory as to whether he was concerned with Petitioner's competency to proceed, but said "[i]f I had some question about his competency during the pendency of my representation, I would have filed a competency evaluation request, which again looking at my file there was none to file." *Id.*, p. 10. He had no memory as to whether Petitioner appeared to be under the influence of medication on the day of trial, but thought that if there had been any question, "I would have done something about it." *Id.*, p. 11. Seliger said he would have raised it and asked to talk about it in front of the judge if he thought his client did not have the ability to help with his defense. *Id.*

Seliger did not recall whether or not Petitioner ever complained about the medication he was taking, and there was nothing written in his file about it. *Id.*, p. 12. If

Seliger had thought there was a problem at any time during his representation, he said he would have raised the issue. *Id.*, p. 13.

Asked about Dale Williams and Tory Hayes, counsel said his notes reflected that Hayes was interviewed and said that he was there and heard the shot, but did not know who did it. *Id.*, pp. 14-15. Seliger could not find any notes about Dale Williams. *Id.*, p. 15. For the record, the court noted that Seliger subpoenaed Officer Hudson, Tory Hayes, Larry Wilcoxson, and Sergeant Ulm. *Id.*, p. 16. Seliger told the judge he had no notes or memory that Petitioner or anyone in his family indicated he was incompetent or under the influence of medication. *Id.*, p. 17. Seliger said that if Petitioner had been acting strangely when he talked to him, Seliger would have told the judge about it. *Id.*

At that point in the testimony, the court asked someone to see if Petitioner wanted to participate in the hearing. *Id.*, p. 18. The bailiff returned and said Petitioner "won't communicate. He won't answer yea or nay, Judge," and the court said "that's fine, I'll take that as a no." *Id.*, p. 19.

Assistant State Attorney Phil Smith testified that he prosecuted three separate cases against Petitioner, including this one. *Id.*, pp. 19-20. He sent an investigator to talk to Wilcoxson, and Wilcoxson told the investigator he did not know "nothing about nothing." *Id.*, p. 20. Smith said that Petitioner did not appear to be under the influence of any substance at the time of trial, that he was involved in the discussions about the case and possible strategies. *Id.*, pp. 21-22. He said there was nothing to make him believe Petitioner did not comprehend what was going on, and Petitioner seemed to Smith to be acting the same as he had the other times Smith had observed him. *Id.*, p. 22. He thought Petitioner responded appropriately at trial to questions asked by the

court, and there was nothing to indicate he was heavily medicated, "nothing that gave me that feeling, either watching him talk, sit or walk." *Id.*, pp. 22-23. He thought Petitioner could aid counsel in his defense, as "if something wasn't going his way testimony-wise, he would let Mr. Seliger know." *Id.*, p. 23. Smith was asked whether, "during the course of the trial or before, you did not observe Mr. Fortson acting erratically or anything other than you'd seen in pre-trial conferences and case management conferences and such?" *Id.* Smith said yes, "but he was – he acted the same way all the time." *Id.*

The court asked the bailiff, "if you'll please go ask [Petitioner] if he wants to testify. This will be his last opportunity to testify in the case in this evidentiary hearing." *Id.*, p. 24. The record reflects a pause which the bailiff checked, the he returned and advised the court,"he won't communicate. He won't say yea or nay." *Id.* The court said ""[a]ll right, that's fine. *He's chosen to present no evidence.* I don't need any argument in the case." *Id.* (emphasis added).

The court found that Wilcoxson could not have been an alibi witness, as Petitioner claimed, because Wilcoxson was apparently there at the time of the shooting.[7] *Id.* The court found Wilcoxson was subpoenaed by the defense but did not testify, and it was presumed it was "because he basically clammed up and wouldn't say anything. So it's certainly not what Mr. Fortson says he would have said, which is he

---

[7] The court seemed to focus on Petitioner's reference to Wilcoxson as an alibi witness. In context, his argument was (and is) that counsel was ineffective for failing to call Wilcoxson, who would have given exculpatory testimony (*i.e.,* that he saw Derrick Horne, not Petitioner, shoot Marlon Horne).

said he would be my alibi witness to say I wasn't there." *Id.*, pp. 24-25 (also noting

there were "a whole bunch of witnesses there at this shooting.").

The court found there was a colloquy at the time of trial which referenced the

waiver at pretrial, and pretrial "would have been the time when people were deciding

whether they were going to have a trial or not a trial . . . ." *Id.*, p. 25.  He said that when

they went through it again at trial, Petitioner "indicated that he knew what he was doing,

that nobody promised him anything and that he wanted a judge trial rather than a jury

trial." *Id.*  The court found no evidence "that Mr. Seliger was deficient in any way in his

representation of Mr. Fortson in this case." *Id.*

The Rule 3.850 motion was denied by written order signed on August 3, 2006.

Ex. L, p 92 (of record) (noting other specific findings had been announced at the

conclusion of the hearing).  The court said that under <u>Strickland</u>, Petitioner would have

to show deficient performance and prejudice to the outcome, and it found no evidence

to support the allegation of deficient performance by counsel.  *Id.*

On appeal, Petitioner argued that the trial court erred in denying appointment of

counsel for the Rule 3.850 proceeding, as the only way Petitioner could have prevailed

was to subpoena the two mental health counselors to testify at the evidentiary hearing,

"that they was [sic] appointed by the trial counsel." Ex. M, p. 5.  He also generally

restated the Rule 3.850 claims.  As to ground four, Petitioner asserted that Wilcoxson

told counsel that Marlon Horne was shot by Derrick Horne.  *Id.*, p. 8, referencing exhibit

B.  There are no exhibits attached to Ex. M in this file, but it seems likely that the

reference was to the affidavit of Wilcoxson attached to doc. 2 in this case.  Petitioner

also filed a supplement on appeal, addressing grounds five and six of the 3.850 motion.

Ex. N.  The state filed an answer brief.  Ex. O.

The appellate court affirmed without opinion.  Ex. P.  Petitioner's motion for

rehearing, Ex. Q, was denied.  Exs. R and S.

**Standard of Review**

"Federal habeas relief is available to state prisoners only after they have

exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v.

Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  To properly

exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented

to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d

438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865

(1995) (*citing* Picard).

If a claim was not fairly presented but is procedurally barred from further state

court review,[8] Petitioner must demonstrate cause for the default and actual prejudice, *or*

demonstrate that the constitutional violation has probably resulted in conviction of an

innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115

L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-

71, 113 L.Ed.2d 517 (1991).

For a claim which was fairly presented and adjudicated on the merits by the state

court, the state court's factual determinations are presumed correct unless the

---

[8] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available."  The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default.  *See* O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

Petitioner rebuts the presumption by clear and convincing evidence. § 2254(e)(1);

Fugate v. Head, 261 F.3d 1206, 1215 and n. 11 (11th Cir. 2001) (citation omitted).

Section 2254(e)(2) provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>   (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;  or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;  and
>
>   (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

As explained by the Supreme Court, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." (Michael) Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000).

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, *himself or herself contributing to the absence of a full and fair adjudication in state court*, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.  *Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.*  Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort.

529 U.S. at 437, 120 S.Ct. at 1491 (emphasis added).

Further, a petitioner is entitled to federal habeas relief only if the state court's

adjudication of the merits of the federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389

(2000); Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125

(2000).

> The "contrary to" clause in § 2254(d)(1) "suggests that the state court's decision must be substantially different" from the relevant Supreme Court precedent. Although a state court's decision that "applies a rule that contradicts the governing Supreme Court law is "contrary," a state court decision that applied "the correct legal rule" based on Supreme Court law to the facts of the petitioner's case would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law. In evaluating the "'unreasonable application' inquiry," the federal court should consider whether the state court's application of the law was "objectively unreasonable" and should not apply the subjective "'all reasonable jurists'" standard. The Supreme Court clarified that, under 28 U.S.C. § 2254(d)(1), the federal court may not issue the writ unless it finds that the state court applied Supreme Court law unreasonably.

Fugate, 261 F.3d at 1216 (summarizing the conclusions in Williams, citations omitted).

For an ineffectiveness of counsel claim, the "clearly established" standard is set

forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of

counsel must identify the acts or omissions of counsel that are alleged not to have been

the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner has a heavy burden, as he must show that "no competent counsel would have taken the action that his counsel did take." <u>Fugate</u>, 261 F.3d at 1217 (citation omitted). There are no rigid requirements or absolute duty to investigate a particular line of defense, and "more is not always better." *Id.* (citations omitted).

Even if Petitioner can show deficient performance, he must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

While <u>Strickland</u> explained the performance and prejudice prongs of analysis, the court need not address them in that order or even address both, as failure to demonstrate either step of <u>Strickland</u> is dispositive of the claim against the petitioner. 466 U.S. at 697, 104 S.Ct. at 2069.

**§ 2254 Petition**

**Grounds One and Two**

In ground one of his § 2254 petition, Petitioner claims that counsel was ineffective for failing to request a competency hearing. Doc. 1, p. 5. He alleges that he had trouble communicating with his counsel, who failed properly to request a psychiatric evaluation through Fla.R.Crim.P. 3.120(b). Doc. 2 (memorandum), p. 3. Instead, he

claims, counsel "presented a mental health doctor to [evaluate] petitioner at the jail,"
who then sent another expert to evaluate him. *Id.* Petitioner claims the expert
prescribed psychotropic medication and subjected him to monthly treatment at the
Apalachee Center for Human Services (ACHS). *Id.*, p. 4. "Rather than alert the court
trial counsel brought a mental health doctor's [sic] and ushered petitioner in and through
a criminal trial facing a penalty of life imprisonment knowing petitioner was on four
different psychotropic medications, and unable to make rational decisions or otherwise
assist in the trial." *Id.*, p. 5. Petitioner asserts that due to his incompetency and use of
these medications, waiver of his rights to a jury trial and to testify in his defense was not
knowing and voluntary. *Id.*, pp. 5-6.

In ground two, Petitioner claims that counsel "allowed petitioner to proceed
through trial drifting through a medicated haze totally unaware of the proceeding.
Petitioner remains vaguely aware of the trial, but recalls counsel's telling him what to
say to the Judge at certain points here and there." *Id.*, p. 6. He again asserts no
recollection of waiving his right to trial by jury. *Id.* He claims he lacked "the capacity to
understand that three state witnesses testified that he pulled a handgun from three
different places and shot the victim," citing the transcript at pp. 20, 59, and 89. *Id.*, pp.
6-7. Petitioner claims that at the Rule 3.850 hearing, the court erred in failing to obtain
information from the ACHS psychiatrist, who would have explained the side effects of
the medication. *Id.*, p. 7.

Attached to the § 2254 memorandum is a psychiatric evaluation of September 18, 2000, reflecting that Petitioner was prescribed Risperdal.[9]  Doc. 2, Ex. A (p. 17 as scanned in ECF).  Also attached is Petitioner's medication log from ACHS for September 18, 2000, to March 14, 2001.  Doc. 2, Ex. B (p. 20 in ECF).  In addition to Risperdal, Petitioner was prescribed Prozac, Zyprexa, and Depakote for the relevant period.[10]  *Id.*  The medication log covers the period of trial and sentencing, held on February 9 and March 28, 2001, respectively.  Ex. B.  Petitioner did not reference this document in his amended Rule 3.850 motion, and apparently did not submit it in support of the motion.  *See* Ex. I, pp. 115-117.[11]

Whether or not the medication log was ever presented to the trial court in support of the Rule 3.850 motion, Petitioner presented no evidence at the hearing.  Ex. K, p. 24.  The court noted the record reflected that Petitioner indicated he knew what he was doing in waiving a jury trial, and there was no evidence to show counsel "was deficient in any way."  *Id.*, p. 25.  Petitioner cannot show this was contrary to or involved an

---

[9] Risperdal is the brand name for Risperidone, is used for treatment of schizophrenia, for short term treatment of bipolar mania, and for the treatment of irritability associated with autistic disorder.  *See* www.risperdal.com.

[10] Prozac, the brand name for Fluxetine Hydrochloride, is an antidepressant, also used for the treatment of other disorders including obsessive compulsive and panic disorder.  *See* www.prozac.com.  Zyprexa, the brand name for Olanzapine, is approved for the treatment of schizophrenia, and for episodes and maintenance treatment of bipolar 1 disorder.  *See* www.zyprexa.com.  Depakote (divalproex sodium) (a compound of sodium valproate and valproic acid) is used to treat manic episodes associated with bipolar disorder, to treat seizures, and to prevent migraine headaches.  *See* www.depakote.com.

[11] Petitioner alleged that the visitor's log at the jail would confirm (though it also was apparently not attached in support) visits by the mental health counselor and a doctor.  *Id.*, pp. 115-116.  Petitioner did not allege any specific drugs that he had taken or that a medication log existed.

unreasonable application of clearly established federal law, or resulted in a decision

based on an unreasonable determination of the facts in light of the evidence presented.

The clearly established law for competency to stand trial is whether the accused

has sufficient present ability to consult with his lawyer with a reasonable degree of

understanding, and has a rational and factual understanding of the proceedings against

him.  Wright v. Secretary for the Dept. of Corrections, 278 F.3d 1245, 1256 (11th Cir.

2002), *citing* Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)

(other citations omitted); Pardo v. Secretary, Florida Dept. of Corrections, 587 F.3d

1093, 1100 (11th Cir. 2009), *cert. denied,* 130 S.Ct. 3334 (2010) (also citing Dusky,

other citation omitted).  Absent evidence of an inability to assist counsel or understand

the charges, "evidence of low intelligence, mental deficiency, bizarre, volatile, or

irrational behavior, or the use of anti-psychotic drugs is not sufficient to show

incompetence to stand trial."  Pardo, 587 F.3d at 1101, citing Medina v. Singletary, 59

F.3d 1095, 1106 (11th Cir. 1995).

> A defendant who was at the pertinent time competent to stand trial is not
> entitled to a new trial on the procedural ground that the trial judge in his
> initial trial failed to hold a competency hearing.  *James v. Singletary*, 957
> F.2d 1562, 1571-72 (11th Cir.1992) (failure to hold competency hearing
> harmless error if defendant was competent at the time of trial).  In a similar
> way, defense lawyers cannot have improperly prejudiced a defendant –
> depriving him of his constitutional right to counsel – by not asserting the
> need for (or appealing about) a competency hearing when the defendant
> was, in fact, competent for the pertinent period.

Moore v. Campbell,  344 F.3d 1313, 1324 (11th Cir.2003), *cert. denied*, 540 U.S. 1180

(2004).[12]  *See also*, Pardo, 587 F.3d at 1102 (where counsel had Pardo evaluated and

---

[12] As explained in James v. Singletary:

no doctor or expert found him incompetent, counsel acted reasonably in his investigation and determination not to seek an evidentiary hearing regarding competency).

Petitioner has never demonstrated either that he was unable to consult with his lawyer with a reasonable degree of understanding, or lacked a rational and factual understanding of the proceedings. The state court could properly rely on the testimony of defense counsel and the attorney for the prosecution since Petitioner presented no evidence at all. Instead, he behaved in such a way that he could not be physically present in the courtroom, and despite opportunities to return (if he would agree to act appropriately), he refused further communication with the court.

From the judge's comments at the evidentiary hearing it is apparent that Petitioner actually *did* understand why he was there. The judge stated for the record that on the previous day Petitioner was upset about getting his witnesses to the hearing, and the judge tried to help him by calling Petitioner's mother. Even if Petitioner failed to act with diligence in producing any other witnesses at the hearing, he could have testified about his state of mind at the time of trial (including ability to consult with

---

[T]here are two kinds of incompetency claims. First, a petitioner may allege that the trial court denied him or her due process by failing sua sponte to hold a competency hearing. This is a *Pate* claim. Second, a petitioner may allege that he or she was denied due process by being tried and convicted while incompetent. This is a substantive claim of incompetency. To put it bluntly, a *Pate* claim is a substantive incompetency claim with a presumption of incompetency and a resulting reversal of proof burdens on the competency issue.

957 F.2d at 1571-1572, discussing Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The distinction makes no difference here, as there has never been a factual showing that Petitioner was incompetent to stand trial.

counsel and understanding of the proceedings against him), and to the effect

medications had on him during the relevant period. Petitioner has no one but himself to

blame for failing to present this evidence. Mr. Seliger did testify at the hearing, and said

if he had noticed any problems with Petitioner around the time of trial he would have

advised the court. The prosecutor said Petitioner acted at trial the way he acted all the

other times he observed Petitioner. The trial court properly accepted the testimony of

the attorneys as true since no other evidence was presented.

Petitioner's belligerence in the courtroom when he was told he would not be

represented by counsel at the Rule 3.850 hearing was entirely consistent with his

conduct at trial, when the court announced its verdict. Moreover, the trial transcript

reflects that Petitioner properly conducted himself throughout the trial, up until the time

he was declared guilty on two of the three counts. That Petitioner was angry and acted

inappropriately when things did not go favorably for him, or that he was taking

medication, is insufficient to show incompetence to stand trial. Pardo, 587 F.3d at 1101.

Absent any colorable showing of incompetency Petitioner's claims, whether based on

counsel's conduct or any error of the trial court, must fail.

**Ground Three**

In ground three, Petitioner claims it was error for the state court to deny his

petition for writ of habeas corpus as untimely. Id., pp. 7-8. A defect in a collateral

proceeding is unrelated to the cause of detention. See, Quince v. Crosby, 360 F.3d

1259, 1261-62 (11th Cir. 2004), cert. denied, 543 U.S. 960 (2004), citing Spradley v.

Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (other citations omitted); In re Rutherford,

437 F.3d 1125, 1127 (11th Cir. 2006) (citing Quince and Spradley); Anderson v.

<u>Secretary for Dept. of Corrections</u>, 462 F.3d 1319, 1330 (11th Cir. 2006), *cert. denied,* 549 U.S. 1216 (2007) (citing <u>Spradley</u>).  This is not a cognizable § 2254 claim.

**Ground Four**

In ground four, Petitioner asserts that his attorney interviewed Larry Wilcoxson before trial, and learned that Wilcoxson would testify that it was Derrick Horne, not Petitioner, who shot Marlon Horne (Derrick's brother).  Doc. 2, p. 8.  Petitioner alleges that prosecutor Phil Smith tampered with evidence by sending an investigator to persuade Wilcoxson (then under house arrest) not to testify.  *Id.*  He alleges that Smith persuaded trial counsel not to tell Wilcoxson the trial date, and persuaded counsel not to take depositions.  *Id.*  Petitioner alleges that Smith concocted the story, of Petitioner saying during the shooting that it was because Marlon Horne testified against him, and that Smith instructed Marlon Horne and his family to so testify at trial.  *Id.*, p. 9. Petitioner claims Smith did this because Petitioner beat the more severe charges in two other cases prosecuted by Smith, and Smith "took it personal."  *Id.*  Given the inconsistent testimony of other witnesses, Petitioner claims, the failure of his attorney to call Wilcoxson as a witness was prejudicial.  *Id.*

Attached to the § 2254 memorandum is a subpoena for Wilcoxson to appear at the Gadsden County Courthouse Annex Tuesday through Friday, February 6-9, 2001, at 9:00 A.M.  Doc. 2, Ex. D (p. 27 in ECF). The subpoena was issued by Petitioner's attorney on January 17, 2001.  *Id.*  This directly contradicts Petitioner's claim that Wilcoxson was never advised of the time or place where he was to testify.

Petitioner also supplied with his § 2254 memorandum an affidavit signed by

Wilcoxson on April 28, 2005.  Wilcoxson said he was at a nearby friend's house the day

of the shooting when Petitioner came by, carrying a wooden cane, then:

> Marlon Horne showed up and came over to where we were all standing
> and he and Jarvis began arguing about some drugs that Marlon had given
> to Jarvis to sell.  Jarvis told Marlon "don't sweat me nigger."  Marlon got
> mad and attempted to bend over and pick up a metal rake but Jarvis
> swung the wooden cane at Marlon and before Jarvis could swing at him
> again, Marlon took off running and Jarvis ran behind him with the cane,
> swinging it.  Marlon's brother Derrick Horne chased behind them shooting
> a small handgun at Jarvis and accidentlally [sic] shot his own brother,
> Marlon.  Jarvis had kept running so he wouldn't get shot.  Derrick had
> stopped chasing Jarvis to help Marlon, and when all of us ran over, Marlon
> was bleeding around the neck o the left side.  We all heard Derrick
> repeatedly apologizing about shooting Marlon.  Derrick and two other
> people moved Marlon close to their house and that's when Derrick said
> "man I am gonna tell the police that nigga Jarvis shot you."  Once Marlon
> was leaned against a three [sic, presumably tree], Derrick ran to go hide
> his gun.  Jarvis' lawyer called me and came to my house and I told him all
> this and that I would testify and tell what really happened.  About a week
> later, a man named Phil Smith, called me and told me he was looking
> int[o] the shooting and I told him the exact same thing I told the lawyer, Mr.
> Seliger.  He told me he would call me back and Mr. Seliger had told me
> that he would call me to trial to testify about this.  Mr. Seliger had given me
> his business card also.  I didn't know that Jarvis was in prison for the same
> case because Mr. Seliger had called me back to tell me that Jarvis was at
> some mental health clinic an[d] the case would be thrown out, so I didn't
> have to testify.  I had no reason to believe otherwise.  However, I have
> recently come to learn that Jarvis did have to [go to] trial and that Mr.
> Seliger had misled me completely.

Doc. 2, Ex. D (pp. 28-29 in ECF).  The affidavit was signed before a notary, who

indicated Wilcoxson "did take an oath."  *Id.*

There is no indication that this document was presented to the trial court in

connection with the Rule 3.850 proceedings.  Wilcoxson is mentioned in the first Rule

3.850 motion, but his expected testimony is not, nor is there an affidavit from Wilcoxson.

Ex. G, p. 3.  Petitioner alleged in his second Rule 3.850 (ground one) that Wilcoxson

would have testified that Petitioner "never produced a weapon or shot the alleged victim," Ex. I, p. 8, but there is no affidavit attached. *Id.* The trial court granted an evidentiary hearing on this ground. Ex. J. The affidavit filed in this court was signed after the amended Rule 3.850 motion was signed by Petitioner on February 7, 2005, and before the court denied relief as to some claims on December 15, 2005. Exs. I and J. It predates the evidentiary hearing held on July 27, 2006. Ex. K. Respondent provided the trial court's docket, Ex. AA, reflecting that Petitioner filed a number of documents before the hearing, but not all state court filings are in the record before this court, and there is no indication that he filed Wilcoxson's affidavit in the Rule 3.850 court. Petitioner asserted much more specifically on appeal from denial of his Rule 3.850 motion that "Mr. Wilcoxson told trial counsel that Marlon Horne was shot by his brother Derrick Horne. (Exhibit B)." Ex. M, p. 8 (asserting that counsel talked to Wilcoxson but failed to subpoena him for trial). There are no exhibits in the copy of the appellate brief filed as Ex. M here, however.

Further, Petitioner did not present Wilcoxson as a witness at the evidentiary hearing, and refused to make any argument or give his own testimony at that time.[13] The trial court was entitled to rely on the testimony of defense and prosecution counsel, that Wilcoxson would not have given testimony favorable to the defense. Counsel did not perform unreasonably and there is no prejudice to the outcome where he failed to call a witness whose testimony would not have been favorable. Petitioner cannot

---

[13] As noted above, according to Wilcoxson's 2005 statement, Petitioner was running behind Marlon Horne. Derrick Horne ran behind them trying to shoot Petitioner but accidentally shot his brother Marlon instead. If this was what happened, then Petitioner could have testified to these facts at the Rule 3.850 hearing.

demonstrate that the state court's determination of this claim was contrary to or involved an unreasonable application of clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented.

### Certificate of Appealability

For all the reasons set forth above, Petitioner is not entitled to a certificate of appealability as he has not made a substantial showing of the denial of a constitutional right. § 2253(c)(2). *See also* § 2254 Rule 11(a) (the district court must issue or deny a certificate of appealability under § 2253(c)(2) when entering a final order adverse to habeas corpus applicant).

### Recommendation

It is therefore respectfully **RECOMMENDED** that the § 2254 petition, challenging the judgment of the Second Judicial Circuit, Gadsden County, case number 99-760-CFA, be **DENIED WITH PREJUDICE**, and that a certificate of appealability be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on September 22, 2010.


 S/  William C. Sherrill, Jr.   
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.